EVELYN V., Hubert B., Robert S., Jill B., Daniel H., and Sara R., individually and on behalf of all others similarly situated, Plaintiffs,

v.

KINGS COUNTY HOSPITAL CENTER; James Buford, as Executive Director of Kings County Hospital Center; New York City Health and Hospitals Corporation; J. Emilio Carrillo, as President of the Board of Directors of the New York City Health and Hospitals Corporation; the Board of Directors of the New York City Health and Hospitals Corporation; Gregory Kaladjian, as Acting Commissioner of the New York State Department of Social Services, and Mark Chassin, as Commissioner of the New York State Department of Health, Defendants.

No. CV 91–1108 (RR).

United States District Court, E.D. New York.

Jan. 30, 1997.

Social Justice Project BLS Legal Services Corporation, Brooklyn, NY, by Jane Greengold Stevens, for Plaintiffs.

The Legal Aid Society, New York City, by Helaine Barnett, Attorney-in-Charge, Rolando T. Acosta, Constance P. Carden, Susan Sternberg, Brooklyn Neighborhood Office, Brooklyn, NY (Scott Rosenberg, Director of Litigation, of counsel) Civil Appeals & Law Reform Unit, New York City, for Plaintiffs.

The Honorable Paul A. Crotty, Corporation Counsel for the City of New York, New York City, by Muriel Goode–Trufant, Georgia Pestana, for Defendants Kings County Hospital, James Buford, New York City Health and Hospitals Corporation, J. Emilio Carrillo, and the Board of Directors of the New York City Health and Hospitals Corporation.

The Honorable Dennis C. Vacco, Attorney General of the State of New York, New York City, (Susan Watson, Assistant Attorney General, of counsel), for Mary E. Glass and Barbara A. DeBuono.

### MEMORANDUM AND ORDER

RAGGI, District Judge:

For the second time in this case, the court is asked to decide whether patients who seek and obtain medical care at New York's Kings County Hospital Center can maintain an action pursuant to 42 U.S.C. § 1983 (1994) for alleged violations of Title XIX of the Social Security Act, more commonly referred to as Medicaid, 42 U.S.C. § 1396 *et seq.* (1994).[1] In 1993, this court dismissed plaintiffs' § 1983 claim against Kings County Hospital, its Executive Director, its Board of Directors, and the President of its Board, finding that the sections of the Medicaid Act invoked by plaintiffs did not unambiguously confer on them statutory rights enforceable as against these city defendants. *Evelyn V. v. Kings County Hosp. Ctr.*, 819 F.Supp. 183 (E.D.N.Y.1993) (hereinafter referred to as "*Evelyn V.* I"). Familiarity with that decision is presumed. Now, defendants Mary E. Glass, Commissioner of the New York State Department of Social Services, and Barbara A. DeBuono, Commissioner of the New York State Department of Health (referred to collectively herein as the "State defendants"), move for summary judgment against plaintiffs on the § 1983 claim brought against them. Plaintiffs oppose this motion and themselves seek summary judgment on their § 1983 claim. The court has reviewed the submissions of the parties and considered their oral arguments. It concludes that summary judgment is appropriately entered in favor of the State defendants.

### Factual Background

1. *42 U.S.C. § 1396a(a)(9)—The Source of the Asserted Federal Statutory Right*

The court will not here repeat those facts about plaintiffs, Kings County Hospital, or the Medicaid program that were detailed in

its decision in *Evelyn V.* I. It notes simply that the crux of plaintiffs' claim against the State defendants is that these entities have historically failed to take the steps reasonably necessary to ensure that Kings County Hospital complies with established *state* health standards. Plaintiffs submit that 42 U.S.C. § 1396a(a)(9) gives them a federal right to such enforcement of state standards by the defendants. That section states in pertinent part:

> A state plan for medical assistance must—(9) provide—(A) that the State health agency, or other appropriate State medical agency (whichever is utilized by the Secretary for the purpose specified in the first sentence of section 1395aa(a) of this title), shall be responsible for establishing and maintaining health standards for private or public institutions in which recipients of medical assistance under the plan may receive care or services.

Subpart (9) of § 1396a(a) is one of 62 subparts setting forth the required contents for state Medicaid plans. Plans must be approved by the Secretary of Health and Human Services ("HHS") before a state can receive Medicaid funds. 42 U.S.C. § 1396a(b). It is undisputed that New York State's Medicaid Plan has been approved by HHS. The plan is encompassed in New York Social Services Law § 363 *et seq.* (McKinney 1992 & Supp.1996) and regulations promulgated thereunder. The New York State Department of Social Services is the agency that administers New York's plan. *See* 42 U.S.C. § 1396a(a)(5) (single state agency must be chosen to administer Medicaid plan). But it is the State Department of Health that is charged with "establishing and maintaining standards for" hospitals participating in the Medicaid program. 42 U.S.C. § 1396a(a)(9); N.Y.Soc.Serv.L. § 364(2)(a). General standards for health care facilities are specified in Department of Health regulations at 10 NYCRR Parts 400 and 401. Specific standards for hospitals are specified at 10 NYCRR Part 405.

---

1. The court cites herein to the 1994 edition of the United States Code and the Code of Federal Regulations as revised in October 1, 1995, unless earlier versions of the cited statutes and regulations are pertinent to the court's analysis.

## 2. The Federal and State Survey Process

As evidence that the State defendants are failing to meet their obligations pursuant to 42 U.S.C. § 1396a(a)(9) with respect to Kings County Hospital, plaintiffs point to various surveys of the hospital over the years revealing noncompliance with health standards. Before the court reviews these surveys, it must note that the Department of Health surveys hospitals in order to ensure compliance with both federal and state law.

42 U.S.C. § 1395aa(a), expressly referred to in § 1396a(a)(9), provides for the Secretary of HHS to contract with state health agencies to certify those institutions qualifying for Medicaid participation. This law states:

The Secretary shall make an agreement with any State which is able and willing to do so under which the services of the State health agency or other appropriate State agency (or the appropriate local agencies) will be utilized by him for the purpose of determining whether an institution therein is a hospital or skilled nursing facility, or ... a home health agency, or ... a hospice program or ... a rural health clinic, [or] a rural primary care hospital, ... or a comprehensive outpatient rehabilitation facility.... To the extent that the Secretary finds it appropriate, an institution or agency which such a State (or local) agency certifies is a hospital, skilled nursing facility, rural health clinic, comprehensive outpatient rehabilitation facility, home health agency, or hospice program (as those terms are defined in section 1395x of this title) may be treated as such by the Secretary.

Further, 42 U.S.C. § 1395aa(c), provides for the Secretary to use state health agencies to conduct surveys of hospitals participating in the Medicaid program. It states:

The Secretary is authorized to enter into an agreement with any State under which the appropriate State or local agency which performs the certification function described in subsection (a) of this section will survey, on a selective sample basis (or

where the Secretary finds that a survey is appropriate because of substantial allegations of the existence of a significant deficiency or deficiencies which would, if found to be present, adversely affect health and safety of patients), hospitals which have an agreement with the Secretary under 1395cc of this title and which are accredited by the Joint Commission on Accreditation of Hospitals. The Secretary shall pay for such services in the manner prescribed in subsection (b) of this section.

42 C.F.R. § 488.26(c)(1) describes the survey process as "the means to assess compliance with Federal health, safety and quality standards." These federal standards are detailed at 42 C.F.R. § 482.1–482.66.[2]

The Secretary of HHS has entered into an agreement with the New York State Department of Health to perform the certifications and surveys provided for in these statutes and regulations. It is expressly recognized in the agreement that, in performing its contractual duties, "the State acts on behalf of the Secretary," who remains "the real party in interest in administering the program established by the Act." (*See* Defendants' Exhibit 1, Art. II, ¶ F.)

As a general rule, institutions accredited as hospitals by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), a private group that annually reviews more than 5,000 of the nation's hospitals, are deemed qualified to participate in Medicare/Medicaid. *See* 42 C.F.R. § 488.5(a), (b). The Secretary of HHS may, however, request a state agency such as the Department of Health to conduct a "validation survey" to determine whether an accredited hospital does, in fact, meet Medicare/Medicaid participation standards. *See* 42 C.F.R. § 488.10(c). The Secretary may also request the Department of Health to conduct "allegation surveys," when HHS receives information indicating that a hospital may be out of compliance with the conditions for participation in Medicaid/Medicare, and "monitoring surveys," to determine if past-

---

**2.** 42 U.S.C. § 1395x(e)(9) empowers the Secretary to set standards of care for Medicare providers. Hospitals participating in Medicaid must meet standards for Medicare. *See* 42 C.F.R. § 482.1(a)(3).

noted deficiencies have been corrected. Survey reports are submitted to HHS, which makes the final determination as to whether a hospital may continue to participate in the Medicare/Medicaid programs. *See* 42 C.F.R. § 488.12 (survey reports constitute "recommendations" to the Health Care Financing Administration of HHS; based on these recommendations HHS will take appropriate action). If a survey reveals that a hospital is not in compliance with one or more federal standards, its ability to continue participating in Medicare/Medicaid programs depends on its submission of "an acceptable plan of correction for achieving compliance within a reasonable period of time acceptable to the Secretary." 42 C.F.R. § 488.28(a). Ordinarily, a deficient hospital is expected to bring itself into compliance with federal conditions within 60 days, but the Secretary may grant additional time where appropriate. 42 C.F.R. § 488.28(d). Where non-compliance is acute or persistent, the Secretary is empowered to terminate a hospital from participation in the Medicare/Medicaid programs. *See* 42 U.S.C. § 1395cc(b)(2). The parties agree that such termination would effectively shut down a public hospital since it could not operate without federal funds.

In addition to conducting these federally requested surveys, the Department of Health also uses on-site surveys to assess hospitals' compliance with state standards of care. *See* N.Y. Pub. Health L. § 2803(1)(a) (McKinney 1993 & 1996 Supp.). Should deficiencies be detected with respect to these standards, hospitals are required to submit plans of correction, which are reviewed through follow-up surveys. Where appropriate, the Department of Health can commence an enforcement proceeding against a deficient hospital, with possible penalties ranging from a fine to revocation of a hospital's operating certificate and closure. *See* N.Y. Pub. Health L. §§ 2803(7), 2806. Not surprisingly, the Department of Health conserves resources by often conducting federal and state surveys together.

### 3. *The Survey History of Kings County Hospital*

The survey history of Kings County Hospital from 1987 through 1994 is complicated by the fact that surveys, reports on their outcomes, and efforts to correct deficiencies often overlap in time. The court generally endeavors to set forth events in chronological order.

On August 5, 1987, November 10, 1987, November 23, 1987, January 13, 1988, and September 27, 1988, the Department of Health cited Kings County Hospital for numerous violations of state health standards.[3] A state enforcement action was commenced.

In January and February 1989, HHS requested that the Department of Health conduct an allegation survey of Kings County Hospital. Based on the survey report, HHS concluded that Kings County Hospital was not in compliance with five conditions for participation in Medicare/Medicaid: 42 C.F.R. § 482.12 (Governing Body), 42 C.F.R. § 482.21 (Quality Assurance), 42 C.F.R. § 482.22 (Medical Staff), 42 C.F.R. § 482.24 (Medical Record Services), and 42 C.F.R. § 482.55 (Emergency Services). By letter dated April 6, 1989, HHS advised the hospital that a "complete Medicare survey" would be conducted by the Department of Health after which the hospital would be expected to submit a plan for correction. HHS warned that "[i]f the hospital is unable to achieve compliance with the Medicare Conditions, termination action will be pursued." (*See* Defendants' Exhibit 4.)

Before conducting this "complete Medicare survey," the Department of Health settled its state enforcement action with Kings County Hospital. In a stipulation dated April 19, 1989, the hospital agreed to pay a fine of $40,000 ($14,000 of which was suspended for a period of one year) and to implement a detailed plan of correction. (*See* Defendants' Exhibit 6.)

In June 1989, the Department of Health conducted the federal survey of Kings Coun-

---

**3.** The parties have supplied the court with the actual findings of most of the surveys referred to in this memorandum. Although the court does not detail the specific problems identified in this memorandum, it is beyond dispute that the hospital was encountering numerous difficulties during the period at issue.

ty Hospital requested by HHS earlier that year. The Hospital was found out of compliance with seven conditions of participation in Medicaid/Medicare, 42 C.F.R. § 482.12 (Governing Body), 42 C.F.R. § 482.21 (Quality Assurance), 42 C.F.R. § 482.22 (Medical Staff), 42 C.F.R. § 482.24 (Medical Record Services), 42 C.F.R. § 482.28 (Food and Dietetic Services), 42 C.F.R. § 482.41 (Physical Environment), and 42 C.F.R. § 482.42 (Infection Control), and eight state health standards, 10 NYCRR § 405.2 (Governing Body), 10 NYCRR § 405.3 (Administration), 10 NYCRR § 405.4 (Medical Staff), 10 NYCRR § 405.6 (Quality Assurance), 10 NYCRR § 405.10 (Medical Records), 10 NYCRR § 405.11 (Infection Control), 10 NYCRR § 405.23 (Food and Dietetic Services), and 10 NYCRR § 405.24 (Environmental Health).

Efforts were undertaken by the hospital to correct the cited deficiencies. The Department of Health conducted a follow-up survey in August 1989 and, based on its report, HHS concluded that Kings County Hospital had attained compliance with all conditions for participation in Medicare/Medicaid except those relating to physical environment. HHS accepted the hospital's long range plan for correction of environment deficiencies.[4] It did, however, advise the hospital that it would no longer be "deemed" eligible for Medicare/Medicaid participation based on its JCAHO accreditation. Rather, it would be closely monitored by the Department of Health. Department monitoring reports from September, October, and November, 1989, indicate that, although the hospital was still experiencing compliance difficulties, significant improvements were being made. (*See* Defendants' Exhibit 7.)

The Department of Health did not conduct, nor does it appear that HHS requested, any comprehensive survey of Kings County. Hospital in 1990. Instead, during that year, the Department of Health investigated 29 specific complaints about hospital care and conditions. On-site investigations resulted in the issuance of eleven statements of deficiencies requiring corrections.

From January 7–18, 1991, the Department of Health conducted a federal monitoring survey at Kings County Hospital. Based on findings that the hospital was out of compliance with five conditions for participating in Medicare/Medicaid, 42 C.F.R. § 482.12 (Governing Body), 42 C.F.R. § 482.21 (Quality Assurance), 42 C.F.R. § 482.22 (Medical Staff), 42 C.F.R. § 482.41 (Physical Environment), and 42 C.F.R. § 482.55 (Emergency Services), HHS notified the hospital by letter dated March 19, 1991 that its "participation in the Medicare program is being terminated ... [as of] May 19, 1991". (Defendants' Exhibit 11.) The hospital was advised that the termination order would be rescinded if it brought itself back to condition-level compliance before the scheduled termination date. (*Id.*)

On April 5, 1991, Kings County Hospital submitted a plan of correction and request for re-survey to the Department of Health. The re-survey revealed that, although problems had not been completely eliminated, Kings County Hospital had managed to achieve condition-level compliance with all federal standards for participation in Medicare/Medicaid except those relating to physical environment. On May 1, 1991, the Department of Health recommended to HHS that Kings County Hospital be permitted to continue to participate in the Medicare/Medicaid programs. HHS agreed and, on May 8, 1991, notified the hospital that it was rescinding its previous termination decision. The hospital was warned that since it had "not demonstrated the ability to sustain the corrective action outlined in the plan submitted in 1989, the time frames in the current submission will be closely monitored and the facility will remain under State survey jurisdiction." (Defendants' Exhibit 13.)

A few days later, on May 10, 1991, the Department of Health issued a report finding that the deficiencies noted at Kings County Hospital in the January 1991 survey constituted violations of state as well as federal standards. A formal enforcement action was commenced. Negotiations to settle this ac-

4. The plan contemplated new construction at the hospital, to be completed by 1992. This target date has been extended repeatedly.

tion with payment of a fine, implementation of various plans of correction, and further monitoring, were interrupted when the death of stabbing victim Yankel Rosenbaum at Kings County Hospital raised further questions about the hospital's delivery of health care. The Department of Health conducted an investigation into Mr. Rosenbaum's treatment at the hospital and, in the fall of 1991, cited the hospital for further violations of state health standards. (Defendants' Exhibit 15.)

Soon thereafter, in October 1991, the Department of Health conducted another federal survey of Kings County Hospital and again found a host of serious departures from federal and state standards. Thus, HHS again threatened to terminate the hospital from participation in the Medicare/Medicaid programs (Defendants' Exhibit 17), and the Department of Health formally cited the hospital for violations, demanding a plan of correction by November 22, 1991. (Defendants' Exhibit 18.)

The Department of Health re-surveyed the hospital in early December 1991 and issued its report to HHS on December 6, 1991. (Defendants' Exhibit 19.) On December 16, 1991, HHS decided once again to rescind its termination of Kings County Hospital from the Medicare/Medicaid programs, finding that, in the re-survey, the hospital had managed to demonstrate condition-level compliance with all requirements except physical environment. (Defendants' Exhibit 19.)

On February 3, 1992, the Department of Health advised Kings County Hospital that it was amending the pending State enforcement action to add the deficiencies cited during the October 1991 survey. (Defendants' Exhibit 21.) This action was settled on July 10, 1992. By stipulation, Kings County Hospital agreed to a $14,000 fine ($4,000 of which was suspended) and implementation of plans

of correction. To monitor the hospital's compliance with the plans of correction, the Department of Health was to conduct monitoring visits in October 1992, February 1993, and July 1993. (Defendants' Exhibits 22 and 23.)

Soon after the October 1991 Department of Health survey, Kings County Hospital was surveyed by the Joint Commission on Accreditation of Healthcare Organizations to determine whether the hospital should be reaccredited. In January 1992, the JCAHO notified the hospital that it was recommending against accreditation. (Plaintiffs' Exhibit 1.) In fact, JCAHO would ultimately permit the hospital to operate with "conditional accreditation."

In October 1992, the Department of Health conducted its first monitoring visit of Kings County Hospital pursuant to its July 1992 order of settlement with the hospital. The hospital was cited for numerous specific and general violations of 10 NYCRR § 405.4 (Medical Staff), 10 NYCRR § 405.6 (Quality Assurance), 10 NYCRR § 405.9 (Admission/Discharge Procedures), 10 NYCRR § 405.10 (Medical Records), 10 NYCRR § 405.17 (Pharmaceutical Services), and 10 NYCRR § 405.19 (Emergency Services). The Department demanded that the hospital provide a plan for correction. (Defendants' Exhibit 24.)

In January 1993, the Department of Health conducted a comprehensive state and federal survey of Kings County Hospital. Although numerous deficiencies were cited (Defendants' Exhibits 28, 29), HHS apparently did not think these warranted any action against the hospital as a Medicare/Medicaid provider.[5] On March 17, 1993, however, the hospital did submit a plan to the Department of Health to correct the noted deficiencies. (Defendants' Exhibit 30.) Parts of the plan were deemed unac-

---

5. As defendants note, and plaintiffs do not dispute, it is rare for a hospital survey to reveal no deficiencies whatsoever. But there is a difference between standard deficiencies and condition-level non-compliance for purposes of Medicare/Medicaid participation. Only the latter exposes a health care provider to termination from the federal programs. In deciding whether a hospital is out of compliance with a Medicare/Medicaid condition, consideration must be given to the number and significance of the deficiencies and their potential adversely to affect the health and safety of patients. This court does not here assess the seriousness of the January 1993 deficiencies. It notes only that the Secretary of HHS did not thereafter take action against the hospital.

ceptable, (Defendants' Exhibit 31), prompting resubmissions by the hospital in June and July 1993. (Defendants' Exhibits 32, 33.) In July 1993, the Department of Health conducted a monitoring visit of the hospital. Not surprisingly, various deficiencies were again noted. (Defendants' Exhibit 35.) Nevertheless, in August 1993, the department accepted the hospital's most recent plan for correction. (Defendants' Exhibit 34.)

In November 1994, Kings County Hospital was scheduled to be reviewed by the JCAHO. Having operated for some time with only a "conditional accreditation," the hospital understood that it would have to pass the JCAHO review or lose its accreditation and, thereby, its status as a Medicare/Medicaid provider. To assist the hospital in preparing for the review, New York City's Health and Hospitals Corporation arranged for a mock survey to be conducted in May 1994. In July 1994, the results were announced: numerous problems existed with respect to the hospital's assessment of patients, pharmaceutical services, patient rights, information management, leadership, discharge planning and other social work, nursing care, dietary services, emergency services, physical rehabilitation services, medical records, and plant and safety management. (Plaintiffs' Exhibit 7.) Dr. Bruce Siegel, then-President of the Health and Hospitals Corporation, publicly stated that Kings County Hospital could not be accredited in its then-existing condition. David Firestone, *Interim Director Is Named At Kings County Hospital,* N.Y. Times, July 22, 1994, at B3. Ed Larkins, the hospital's then-Executive Director was replaced with Jean Leon, an administrator who had helped both Harlem and Metropolitan Hospitals prepare for and pass JCAHO accreditation surveys. *Id.* The Health and Hospital Corporations also authorized a one-time allocation of $1,141,348 to Kings County Hospital to address various needs that would be pertinent to the JCAHO review. (Plaintiffs' Exhibit 14.) Apparently, these efforts proved successful. Kings County Hospital was again accredited by the JCAHO.

## Discussion

Plaintiffs in this case assert that 42 U.S.C. § 1396a(a)(9) confers on them a federal right enforceable through 42 U.S.C. § 1983 to have the New York State Department of Social Services and the New York State Department of Health take reasonable steps to ensure that hospitals operating as Medicaid providers comply with state standards of operation. In moving for summary judgment in their favor, the State defendants submit (1) that plaintiffs have failed to state a claim since 42 U.S.C. § 1396a(a)(9) does not confer the right asserted by plaintiff; and (2) that, even if the court were to find such an enforceable federal right, their actions suffice to satisfy their legal obligations. This court agrees that plaintiffs' have failed to state a claim upon which relief can be granted.

In *Evelyn V.* I, this court discussed in detail the case law relevant to considering a § 1983 claims based on a federal statute. *Evelyn V. v. Kings County Hosp. Center,* 819 F.Supp. 183, 190–94 (E.D.N.Y.1993). The applicable principles of analysis have not changed. A court must begin with the two-step test first articulated in *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106–07, 110 S.Ct. 444, 448–49, 107 L.Ed.2d 420 (1989), and thereafter followed in *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509–10, 110 S.Ct. 2510, 2517–18, 110 L.Ed.2d 455 (1990), and *Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068, 2083, 129 L.Ed.2d 93 (1994). In the first step, a court must decide if a case really involves a federal "right," as opposed to simply a claimed violation of federal law. On this point, plaintiffs bear the burden. Factors pertinent to resolution of this issue include (1) whether the statutory provision in question creates obligations binding on the governmental unit as opposed to stating a congressional preference for certain conduct, (2) whether the interest plaintiffs assert is sufficiently specific and definite to be within the competence of the judiciary to enforce, and (3) whether the provision in question is intended to benefit the plaintiffs. If the court is satisfied that plaintiffs have asserted an enforceable right, the second step of the inquiry requires consideration of whether

Congress has foreclosed its enforcement under § 1983. Defendants bear the burden of establishing foreclosure and would have to point to a remedial scheme so comprehensive that allowing plaintiffs to sue under § 1983 would be inconsistent with Congress's carefully tailored scheme. *See Evelyn V. v. Kings County Hosp. Center*, 819 F.Supp. at 192. In applying the *Golden State/Wilder* test, courts must be mindful of the cautionary note struck in *Suter v. Artist M*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). Courts must look carefully at the precise language of any statute relied on by the plaintiffs as the source of the right they seek to enforce, and courts must find that the right at issue is unambiguously conferred by the statute. *See Evelyn V. v. Kings County Hosp. Center*, 819 F.Supp. at 193; *see also Marshall v. Switzer*, 10 F.3d 925, 928 (2d Cir.1993) (reconciling *Wilder* and *Suter*); *Chan v. City of New York*, 1 F.3d 96, 104 (2d Cir.), *cert. denied*, 510 U.S. 978, 114 S.Ct. 472, 126 L.Ed.2d 423 (1993) (finding that plaintiffs § 1983 claim was actionable under either the *Wilder* or *Suter* analysis).

Applying these principles to plaintiffs' claim pursuant to 42 U.S.C. § 1396a(a)(9), the court notes that two of the three prongs of the first test in *Golden State* are easily satisfied. The terms of the statute are mandatory not precatory: "A State plan for medical assistance *must ... provide....*" (Emphasis added). Moreover, "[l]ogic dictates that the intended beneficiaries of such a requirement are the 'recipients of medical assistance under the plan' expressly mentioned therein." *Evelyn V. v. Kings County Hospital*, 819 F.Supp. at 194 (citation omitted).

■ The problem in this case is in deciding precisely what it is Congress has mandated in § 1396a(a)(9) for the benefit of Medicaid recipients. Congress requires state Medicaid plans to provide for a state health agency to "be responsible for *establishing and maintaining health standards for*" institutions such as Kings County Hospital, which operate as Medicaid providers. (Emphasis added). The parties agree that the New York plan provides for the Department of Health to serve this statutory function. They agree that the Department of Health has "established" standards for state hospitals. 10 NYCRR Parts 400, 401, 405. Where the parties disagree is in their interpretation of the statute's requirement with respect to "maintaining health standards." A thing is "maintained" when it is kept "in a state of repair, efficiency, or validity," when it is "preserve[d] from failure or decline." Webster's Third New International Dictionary 1362 (1986). Defendants submit that the statute thus obligates them to review their health standards and, when necessary, update them to ensure that they remain valid and consistent with current medical practice. Plaintiffs submit that the statutory obligation is broader: the State defendants must also use reasonable efforts to ensure that state hospitals participating in the Medicaid program, and particularly Kings County Hospital, operate in compliance with established state standards. The court rejects plaintiffs' construction.

Preliminarily, the court notes that, although § 1983 has been used as a vehicle to enforce federal rights embodied in federal regulations as well as statutes, *see Wright v. Roanoke Redevelopment and Housing Auth.*, 479 U.S. 418, 431–32, 107 S.Ct. 766, 774, 93 L.Ed.2d 781 (1987), it would be quite remarkable for Congress to federalize a whole body of unspecified state rules and regulations and thereby make the state's enforcement of its own standards a federal right that parties could pursue through private § 1983 actions. *See Oberlander v. Perales*, 740 F.2d 116, 119 (2d Cir.1984) (rejecting attempt to enforce state Medicaid regulation through § 1983); *Concourse Rehabilitation & Nursing Center Inc. v. Wing*, 945 F.Supp. 740, 741 (S.D.N.Y. 1996) (alleged violation of state Medicaid plan fails to state federal claim enforceable under § 1983). In fact, the language of § 1396a(a)(9) does not suggest such a sweeping Congressional intent. The statute requires simply that a state agency be responsible for establishing and maintaining health standards "for" participating institutions. An agency can maintain appropriate standards *for* institutions without having any enforcement powers over those institutions. Indeed, the importance of maintaining current health standards for health care institutions is obvious. Few fields have changed as

rapidly in this century as medicine. Surgical procedures, professional training requirements, medication protocols, methods for handling and storing blood, have all evolved considerably, such that standards considered exemplary when § 1396a(a)(9). was first enacted would not be deemed adequate today. Thus, it is entirely sensible to conclude that Congress wished to ensure that states did not view their § 1396a(a)(9) obligation as static. Rather, they would be expected to maintain, *i.e.*, review and update, the health standards they established to ensure that they remained consistent with modern medical practice.

If Congress had wished to mandate enforcement of the state standards, as plaintiffs urge, it could easily have expressed this intent by drafting § 1396a(a)(9) to require maintenance of health standards "at" participating institutions, rather than simply "for" participating institutions. Indeed, as the parties have noted, when the federal government did wish to impose an enforcement obligation on the states with respect to standards for nursing homes, this was plainly expressed. 42 U.S.C. § 1396a(a)(26) requires states to have "medical review teams" conduct "periodic inspections" of such facilities. From 1978 to 1994, 42 C.F.R. § 449.33(5)(iii) required states to review the reports of such medical teams "as they reflect on health and safety requirements and *as necessary take appropriate action to achieve compliance or withdraw certification.*" (Emphasis added). No such survey or compliance obligation has ever been imposed on states with respect to hospitals. In the absence of any language in § 1396a(a)(9), or anywhere else in the Medicare/Medicaid statute or regulations, unambiguously conferring on plaintiffs the right to enforcement of state standards at participating hospitals, this court must grant summary judgment in favor of the State defendants.

█ In an effort to avoid this result, plaintiffs submit that it makes no sense to think that Congress simply wished to require state agencies to promulgate standards and update them from time to time without also contemplating their enforcement. The legislative history reveals that Congress did "contem-plate" local enforcement of state standards, but it did not "mandate" such enforcement. In discussing § 1396a(a)(9), the Senate Report indicates that Congress wished to encourage states to improve health care standards while interfering as little as possible in a state's actual articulation or supervision of those standards. *See* S.Rep. No. 404 (1965), *reprinted in* 1965 U.S.Code Cong. & Admin.News 1943, 2015–16.

> Your committee *expects* that *these provisions* [requiring States to have an agency ... responsible for establishing and maintaining standards for the types of institutions included under the State plan] will be used *to bring about progressive improvement in the level of institutional care and services* provided to recipients of medical assistance. Standards of care in many medical institutions are not now at a satisfactory level and *it is hoped that current standards* applicable to medical institutions *will be improved by the State's standard-setting agency and that these standards will be enforced by the appropriate State body.*

*Id.* at 2016 (emphasis added). Congressional "expectations" and "hopes" do not, however, create unambiguous federal rights enforceable through § 1983. *See Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 1540–41, 67 L.Ed.2d 694 (1981) (Congressional "preferences" do not create enforceable statutory rights).

The overall scheme for review of hospitals participating in Medicare/Medicaid is also at odds with plaintiffs' claim of a federal right to sue State defendants to compel enforcement of state health care standards with respect to hospitals. *C.f., Livadas v. Bradshaw,* 512 U.S. at 132, 114 S.Ct. at 2083 (plaintiff's asserted right to complete the collective bargaining process and agree to an arbitration clause is implicit in the structure of the National Labor Relations Act, even if not provided for in so many words). There is simply no federal requirement that state agencies ever survey hospitals to assess compliance with their own standards. Instead, the focus of the statute and regulations is on the promulgation and enforcement of *federal* standards. It is the Secretary of HHS who

has sole responsibility for promulgating federal health, safety, and quality standards applicable to hospitals participating in Medicare/Medicaid programs, *see* 42 U.S.C. § 1395x(e)(9), and who is charged with enforcing these standards by threatening termination, *see* 42 U.S.C. § 1395cc(b)(2). Not insignificantly given the cooperative aspect of these programs, the statute contemplates considerable consultation between federal and state authorities as the Secretary carries out these mandates. For example, the Secretary is required to confer with "appropriate State agencies and recognized national listing or accrediting bodies" in setting federal standards for participating hospitals. § 42 U.S.C. § 1395z. Moreover, "in the case of any State ... which imposes higher requirements on institutions ... under a State plan ... the Secretary shall impose like requirements as a condition to the payment for services ... in such institutions in such State...." *Id.*[6] Thus, should the Department of Health establish and maintain standards for New York hospitals higher than those set in the federal regulations, these will be enforced with respect to Medicare/Medicaid participants, but by the Secretary of HHS pursuant to 42 U.S.C. § 1395z, not by the state agency pursuant to 42 U.S.C. § 1396a(a)(9). The law also contemplates that state health agencies will, by contractual arrangement with the Secretary, conduct on-site surveys to assess hospital compliance with applicable *federal* standards. 42 U.S.C. § 1395aa(c); 42 C.F.R. § 488.26(c)(1). But the federal government pays for these surveys, 42 U.S.C. § 1395aa(c), and, as the Secretary's contract with the Department of Health expressly states: the agency "acts on behalf of the Secretary" in conducting any survey to determine Medicare/Medicaid compliance, and it is the Secretary who is "the real party in interest in administering the program established by the Act." (Defendants' Exhibit I, Art. II. ¶ F.) When such a survey reveals deficiencies in compliance with federal standards, it is the Secretary who must determine the action to be taken, *i.e.,* whether a plan for correction can be agreed upon or whether termination proceedings must be commenced. 42 C.F.R. § 488.28; 42 U.S.C. § 1395cc(b)(2).

▪ The focus of this statutory and regulatory scheme on the responsibilities of the Secretary of HHS for the promulgation and enforcement of federal standards of health care necessarily supports the conclusion that a state agency satisfies its § 1396a(a)(9) obligations to "establish and maintain" local standards for health care providers simply by promulgating and then updating these standards. In this way, Congress certainly hoped to *encourage* better standards of local health care and even their enforcement. But sensitive to differences in regional capabilities, Congress did not create a federal right to any particular state standard or to any level of local enforcement. The core responsibility for ensuring that Medicare/Medicaid providers meet some minimum standard of care remains exclusively with the federal government.

Because plaintiffs have no federal right to state enforcement of state standards of health care at hospitals participating in the Medicaid program, summary judgment is granted in favor of the State defendants.[7]

---

6. In *Evelyn V. I,* this court rejected plaintiffs' argument that 42 U.S.C. § 1395z thus converted state regulations into privately enforceable federal rights. The court held that the statute, which was directed to the Secretary of HHS, and not any state actor, expressed Congress's intent not to have "federal regulations supersede stricter state ones for participating hospitals." *Evelyn V. v. Kings County Hosp. Center,* 819 F.Supp. at 196.

7. State defendants alternatively seek summary judgment on the grounds that they have taken all reasonable actions to bring Kings County Hospital into compliance with applicable state standards. In support, they cite the numerous surveys they have conducted and the enforcement actions they have pursued. In opposing summary judgment, plaintiffs concede that the State defendants cannot be expected to guarantee a hospital's constant compliance with state health standards. Nevertheless, they submit that the State defendants are obliged to make reasonable efforts to enforce the state standards. They contend that the very fact that Kings County Hospital has regularly been found to have serious deficiencies supports the conclusion that defendants' enforcement efforts have not been reasonable. The argument is troubling for many reasons.

For example, when the court inquired as to what the Department of Health should have done to meet its duty of "reasonable" enforcement,

*Conclusion*

Plaintiffs invoke 42 U.S.C. § 1396a(a)(9) as the source of a federal right to state agency enforcement of state standards of health care at hospitals participating in the federal Medicaid program. Because this court finds that § 1396a(a)(9) does not guarantee any such federal right, it grants judgment in favor of the State defendants on the single claim brought against them pursuant to 42 U.S.C. § 1983. Final judgment is hereby entered in favor of Mary E. Glass, the Commissioner of the New York State Department of Social Services, and Barbara A. DeBuono, the Commissioner of the New York State Department of Health.

*SO ORDERED.*

plaintiffs' suggestions were few. Certainly, plaintiffs do not think the State defendants should have shut down Kings County Hospital. They did propose the imposition of stiffer fines or more frequent surveys, but the court notes that stiffer fines on a hospital with serious budget problems hardly seems an ideal solution, and the Department of Health's resources are already stretched thin. It inspects over 250 hospitals and more than 600 nursing homes.

Although the court does not rely on defendants' alternative argument to support its grant of summary judgment, it does note that, given the very complicated medical, fiscal, and political problems confronting Kings County Hospital, as well as the crushing demand from the community for health care services, it is difficult to assume simply from the fact that defendants' surveys regularly expose serious deficiencies that *the State defendants* are acting unreasonably in their efforts to improve the standards of care at this troubled hospital.