**Juana RODRIGUEZ, et al., Plaintiffs,**

v.

**Barbara DeBUONO, Commissioner of the New York State Department of Health, et al., Defendants.**

### No. 97 CIV. 0700 SAS.

United States District Court,
S.D. New York.

April 19, 1999.

602

**604**

Leslie Salzman, Cardozo Bet Tzedek Legal Services, New York, NY, Donna Dougherty, Queens Legal Services for the Elderly, Rego Park, NY, Michael Scherz, New York Legal Assistance Group. Yisroel Schulman, New York, NY, for plaintiffs.

James M. Hershler, Assistant Attorney General, State of New York, New York, NY, for state defendants.

Michael Hess, Larry Sonnenshein, Mordecai Newman, Adam Kurtz, Assistant Corporation Counsel, City of New York, New York, NY, for City of New York defendants.

Lori A. Alesio, Associate County Attorney, Westchester County, White Plains, NY, for Westchester County defendants.

Derrick Robinson, Assistant County Attorney, Suffolk County, Hauppauge, NY, for Suffolk County defendants.

Michael T. Hopkins, Hopkins, Kopilow & Weil, Garden City, NY, for Nassau County defendants.

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

Table of Contents

I. Procedural Background ................................................. 605
II. Legal Standard for a Permanent Injunction .................................... 607
III. Discussion ....................................................... 607
 A. Plaintiffs' Medicaid Claim ......................................... 608
 1. Legal Standard for a Private Right of Action Under 42 U.S.C. § 1983..... 609
 2. Application of Standard ......................................... 611
 a. 42 U.S.C. 5 1396a(a)(10)(B) ............................... 611
 b. Medicaid Act Regulations..................................... 612
 3. The Merits of Plaintiffs' Medicaid Claims.............................. 613
 a. 42 U.S.C. § 1396a(a)(10)(B) ............................... 613
 b. Plaintiffs' Regulatory Claims ................................. 614
 B. Plaintiffs' Claims Under the Americans With Disabilities Act and the Rehabilitation Act ................................................. 614
 1. Applicability of Anti–Discrimination Statutes to This Case ............... 615
 2. The Merits of Plaintiffs' ADA and § 504 Claims ...................... 618
 a. "Qualified Individual" With a Disability........................... 618
 b. Plaintiffs Are Excluded From Benefits Because of Discrimination Based on Disability ........................................... 619
 c. Reasonable Accommodation....................................... 619
 i. Essential Nature of Program ................................. 619
 ii. Undue Burden........................................... 621
 C. Irreparable Harm ................................................. 623
IV. Conclusion ....................................................... 624

This class action, involving the level of care provided to mentally impaired individuals, arises out of a challenge to New York State's design and implementation of its task-based assessment ("TBA") programs. TBA programs are used throughout the State to determine the amount of personal care services hours provided to eligible Medicaid applicants and recipients. Plaintiffs, New York State Medicaid home care applicants and recipients, suffer from mental disabilities, such as Alzheimer's disease,

that cause them to require assistance with the activities of daily living ("ADL"). Defendants are Barbara A. DeBuono, Commissioner of the New York State Department of Health, and Brian Wing, Acting Commissioner of the New York State Department of Social Services, ("the State"), and the respective Departments of Social Services of the City of New York (the "City"), Nassau County ("Nassau"), Westchester County ("Westchester") and Suffolk County ("Suffolk") (collectively with the State, "Defendants").[1]

Plaintiffs allege that defendants' refusal to include "safety monitoring" as an independent task discriminates against otherwise eligible cognitively impaired individuals in violation of: (1) the Medicaid Act, 42 U.S.C. § 1396 *et seq.* and its regulations; (2) § 504 of the Rehabilitation Act; and (3) the Americans with Disabilities Act ("ADA"). Plaintiffs now move for permanent injunctive relief on all three grounds. For the reasons that follow, plaintiffs' motion is granted.

## I. Procedural Background

Over two years ago, plaintiffs filed a class action complaint and an order to show cause to preliminarily enjoin the State's operation of TBA programs.[2] Following a two week hearing, this Court entered an Amended Order ("August 25 Order"), granting in part and denying in part, plaintiffs' request for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").[3] See *Rodriguez v. DeBuono, supra.* The plaintiffs' motion for a preliminary injunction was also granted in part, based on a finding that plaintiffs had demonstrated a substantial likelihood of success on the merits of: (1) their safety monitoring claim pursuant to the Medicaid Act, 42 U.S.C. § 1396a(a)(10)(B), and its regulations, 42 C.F.R. § 440.240(b); and (2) plaintiffs' claim that due process requires the City's notices of TBA determinations for applicants and recipients to include the number and allocation of authorized hours. See *id.* at 157, 164–65.[4] However, the Court found that plaintiffs failed to make the required showing with regard to their "span of time"[5] claims against the City and Nassau County as well as with the remainder of their notice claims. See *id.* at 161–63, 165, 167. The Court declined to

1. For the sake of expediency, defendants Suffolk and Westchester adopted the memoranda of law submitted by Nassau and the State.

2. The pertinent facts regarding the individual plaintiffs in this suit were set forth in an Order issued on August 25, 1997. See *Rodriguez v. DeBuono*, 177 F.R.D. 143, 148–151 (S.D.N.Y.1997).

3. The Court certified a class consisting of all New York State Medicaid home care recipients whose need for home care services has been or will be determined by TBA (the "Notice" class). The Court then certified two sub-classes of the "notice" class, granting statewide certification to the "safety monitoring" sub-class, but limiting certification of the "span of time" subclass to the City and Nassau. See *Rodriguez*, 177 F.R.D. at 151–52. The Court also granted plaintiffs' request to permit twelve additional Medicaid home care recipients to intervene in this action. See *id.* at 147 n. 2.

4. Specifically, the Court ordered the following relief:

> 1. That defendants include safety monitoring as a separate task on their TBA forms, assess the need for safety monitoring as a separate task, and calculate any minutes allotted for safety monitoring as part of the total personal care services hours authorized, for both applicants and recipients; and
> 2. That the City include the total number of task hours authorized and the allocation of those hours by the number of hours per day as a component of its initial notice, and, to the extent this information is not already included, as a component of its reauthorization notice. See *Rodriguez*, 177 F.R.D. at 167.

5. "Span of time" claims refer to the TBA program's alleged failure to authorize sufficient hours of care to cover the span of time during which unscheduled or recurring needs occur. An example of an unscheduled and recurring need that occurs over a span of time rather than at discrete times is the need for toileting, which can occur at any time of the day or night.

address plaintiffs' ADA and § 504 claims at that time because the preliminary injunctive relief was based on plaintiffs' other claims. *See id.* at 161 n. 23.

In September 1997, defendants appealed and sought an order staying the portion of the preliminary injunction requiring them to provide safety monitoring relief pending appeal. This Court granted defendants' motion for a stay. On November 16, 1998, the Second Circuit vacated the preliminary injunction, without reaching the merits of the appeal, finding that "imminent irreparable harm," an essential requirement for interim relief, had not been shown in light of the District Court's stay pending appeal. See *Rodriguez v. DeBuono,* 162 F.3d 56, 62 (2d Cir.1998), *opinion amended and superseded by Rodriguez v. DeBuono,* 175 F.3d 227 (2d Cir.1999).

On remand, the parties requested further discovery and settlement negotiations regarding plaintiffs' span of time claim.[6] *See* Transcript of December 2, 1998 ("Dec. 2 Tr.") at 16–17. However, all parties sought a swift resolution of the remaining claims. The parties and the Court agreed that the litigation would take "two tracks"—one being a final resolution of the safety monitoring claim, and the other a settlement track for the span of time claim. *See id.* at 11. Accordingly, the span of time claim was bifurcated from the safety monitoring claim, and the parties moved for final resolution of the safety monitoring claim pursuant to Fed.R.Civ.P. 54(b).

Rule 54(b) provides in relevant part:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that

there is no just reason for delay and upon an express direction for the entry of judgment.

Fed.R.Civ.P. 54(b). While the language of the rule does not require the trial court to make either formal findings of fact or conclusions of law in order to certify the judgment under Rule 54(b), I shall nontheless state the reasons justifying the entry of a final order on the safety monitoring claim. *See* 10 *Moore's Federal Practice,* § 54.23[2] (Matthew Bender 3d ed.1999).

First, "a certification under Rule 54(b) should be granted only if there are 'interest[s] of sound judicial administration' and efficiency to be served." *Harriscom Svenska AB v. Harris Corp.,* 947 F.2d 627 (2d Cir.1991) (quoting *Curtiss–Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980)). A court should not enter final judgment on fewer than all the claims in an action if the same or closely related issues remain to be litigated. *See Nat'l Bank of Washington v. Dolgov,* 853 F.2d 57, 58 (2d Cir.1988) (per curiam). Second, "[n]ot all final judgments on individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims." *Curtiss–Wright,* 446 U.S. at 8, 100 S.Ct. 1460. The district court must determine that the final decision on certain claims is ready for appeal, taking into account the equities involved as well as judicial administrative interests. *See id.*

Plaintiffs' counsel expressed strong support for Rule 54(b) certification. *See* Transcript of April 15, 1999 ("Apr. 15 Tr."), at 7–10 (safety monitoring claim is "separable issue factually distinct" from span of time claim; they are "separate questions . . . not closely related"; "[o]nce the Court of Appeals addresses the issue of whether the defendants are obligated to provide [safety monitoring], that is not go-

---

**6.** Although I found plaintiffs did not have a substantial likelihood of success on the merits of the "span of time" claims, the Court left open the possibility that plaintiffs might pres-

ent further evidence after the preliminary stage of the litigation. *See* 177 F.R.D. at 164 n. 29.

ing to be an issue again"). Counsel for defendants the State of New York and Westchester and Nassau Counties agree that it would be "in the interests of justice and the interest of judicial economy" to proceed under Rule 54(b) for a final determination of the "sufficiently separable" safety monitoring claim. Apr. 15 Tr., at 10–11. The City defendants, however, take no position with regard to the Court's authority under 54(b) to issue a final judgment on the safety monitoring claim. *See id.* at 14–15, 100 S.Ct. 1460.

I find that the safety-monitoring claim is separable from plaintiffs' span of time claim. Both claims arise from defendants' implementation of the TBA program. The claim adjudicated in this opinion, however, involves defendants' refusal to provide safety monitoring as an independent task to otherwise qualified mentally impaired Medicaid applicants and recipients. The span of time claim, on the other hand, concerns defendants' alleged failure to authorize sufficient hours of care to cover the span of time during which unscheduled or recurring needs occur. While the claims share some of the same underlying legal issues, for example, Medicaid comparability law, the safety monitoring and span of time claims are factually distinct.

The parties have now briefed the safety monitoring issue twice, and the Court has conducted two weeks of hearings. At this juncture, no further evidence is required. Moreover, the parties themselves are ready to resolve this issue. Finding no just reason for delay, a Rule 54(b) certification is appropriate.

## II. Legal Standard for a Permanent Injunction

■ Generally, to obtain a permanent injunction, a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted. See *New York State, National Organiza-*

tion for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir.1989) (citing *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975)). The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits. *See Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). However, entry of a permanent injunction requires a less stringent standard than that for a preliminary injunction.[7] Although a showing of irreparable harm is required for the imposition of any injunctive relief, preliminary or permanent, *see Sierra Club v. Hennessy*, 695 F.2d 643, 647 (2d Cir.1982), the imminent aspect of the harm is not crucial to granting a permanent injunction. *See Rodriguez* 175 F.3d at —— n. 9.

■ The law in this Circuit requires a showing that irreparable damages are likely, not merely possible. *See JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990); *Jackson Dairy. Inc. v. H.P. Hood & Sons. Inc.*, 596 F.2d 70, 72 (2d Cir.1979). Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation, a preliminary injunction will not issue. *See JSG Trading Corp.*, 917 F.2d at 79.

■ In addition, where, as here, " 'public consequences' are implicated, it is incumbent upon a district court in exercising its discretion to 'balance [ ] the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction.' " *Sierra Club*, 695 F.2d at 649 (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. at 305, 311, 102 S.Ct. 1798 (1982)).

## III. Discussion

Plaintiffs request permanent injunctive relief requiring defendants to provide safe-

---

**7.** In its opinion remanding the case, the Court of Appeals suggested that the Court exercise its discretion to convert a renewed motion for a preliminary injunction into a permanent injunction pursuant to Fed.R.Civ.P. 65(a)(2). *See Rodriguez*, 162 F.3d at 63 n. 9.

ty monitoring to cognitively impaired individuals on three grounds: (1) the Medicaid Act and its regulations, (2) the ADA, and (3) the Rehabilitation Act.

## A. Plaintiffs' Medicaid Act Claim

Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to those whose income and resources are insufficient to procure such services for themselves. States are not required to participate in all aspects of the Medicaid program, but if they do participate in a given program they must comply with the federal Medicaid statute and regulations in administering that program. *See* 42 U.S.C. § 1396a; *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Himes v. Shalala,* 999 F.2d 684, 686 (2d Cir.1993).

The Medicaid Act, 42 U.S.C. § 1396 *et seq.,* provides "medical assistance" to individuals whose income and resources are insufficient to meet the costs of medical care, and who are either age 65 or over, blind, disabled, or members of families with dependent children. "Medical assistance" is defined to include "personal care services furnished ... in a home or other location." 42 U.S.C. § 1396d(a)(xi)(24); N.Y. Soc. Serv. L. § 365–a(2)(e) New York State has chosen to include the federal option for home care services, including "personal care services", in its State Medicaid plan. *See* N.Y. Soc. Serv. L. § 365–a(2)(e); 42 C.F.R. § 440.170(f). "Personal care services" include assistance with tasks associated with the ADL, such as bathing, toileting, assistance with medications, personal hygiene, dressing, feeding and light housekeeping and shopping. *See* 18 N.Y.C.R.R. §§ 505.14(a)(6)(i)(a), (ii)(a).Such assistance must be medically necessary and "essential to the maintenance of the patient's health and safety in his or her own home." N.Y. Soc. Serv. L. § 365–a(2)(e); 18 N.Y.C.R.R. §§ 505.14(a)(1), (4).[8]

Plaintiffs argue that defendants' implementation of TBA violates the Medicaid comparability provision, 42 U.S.C. § 1396(a)(10)(b), which requires that a state plan provide:

> that the medical assistance made available to any individual described in subparagraph (A)—
>
> (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and
>
> (ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A).

42 U.S.C. § 1396a(a)(10)(B)(i) and (ii).

In holding that plaintiffs were entitled to a preliminary injunction based on the likelihood of success on the merits of their comparability claim, the Court found an enforceable private right of action under § 1396a(a)(10)(B). While the Second Circuit did not reach the merits of this claim on appeal, it did suggest that defendants and the District Court had erroneously characterized the private right of action as

---

**8.** To be eligible for the home care program, a patient must have a stable medical condition and be self-directing. *See* 18 N.Y.C.R.R. § 505.14(a)(4). A non self-directing patient may still be eligible for home care services if another self-directing individual or agency is willing to provide the direction of the home care attendant on behalf of the non-self-directing patient "on an interim or a part-time basis." 18 N.Y.C.R.R. § 505.14(a)(4)(ii)(a)-(c).

State regulations permit the authorization for eligible recipients of up to "continuous, 24–hour personal care services," or "uninterrupted care, by more than one person, for a patient who ... requires total assistance with toileting and/or walking and/or transferring and/or feeding at unscheduled times during the day and night." 18 N.Y.C.R.R. § 505.14(3). The State has imposed a fiscal cap on home care services where the cost of medically necessary care exceeds 90% of the cost of a residential health facility and the individual does not meet one of five exceptions. *See* N.Y. Soc. Serv. L. § 367–k.

a jurisdictional issue rather than as a question of whether plaintiffs have failed to state a claim upon which relief can be granted. See *Rodriguez*, 175 F.3d at ——. Consequently, I will now address defendants' renewed arguments against permitting a private right of action on the comparability claims. I will also address the question of whether the Medicaid Act regulations, 42 C.F.R. §§ 440.230(b) and 440.230(c), provide a private right of action.[9]

### 1. Legal Standard for a Private Right of Action Under 42 U.S.C. § 1983

■ Section 1983 imposes liability on anyone who, acting under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Section 1983 can be used to vindicate violations of federal statutory rights, *Maine v. Thiboutot*, 448 U.S. 1, 4–8, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), and its coverage is to be "broadly construed." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). However, not every violation of a federal law amounts to a violation of a federal right. *See Golden State*, 493 U.S. at 106, 110 S.Ct. 444.

■ To determine whether a private right of action exists under a federal statute, plaintiffs must show that the statute is: (1) "intended to benefit" the plaintiffs seeking to enforce it; (2) a "binding obligation on the governmental unit," rather than "merely a congressional preference for a certain kind of conduct;" and (3) not so "vague and amorphous" as to be "beyond the competence of the judiciary to enforce." *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 509, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (quotation marks and citations omitted).

Once plaintiffs have satisfied this test, they are entitled to a rebuttable presumption that their statutory right is enforceable under § 1983. *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). The burden then shifts to the defendants to demonstrate that Congress "by express provision or other specific evidence from the statute itself ... intended to foreclose such private enforcement." *Wilder*, 496 U.S. at 520–21, 110 S.Ct. 2510 (quoting *Wright v. City of Roanoke Redev. and Hous. Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)).

■ In 1992, the Supreme Court departed from earlier precedent finding that no private right of action existed to enforce § 671(a)(15) of the Adoption Assistance Act. *Suter v. Artist M.*, 503 U.S. 347, 364, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). There, the Court found that § 671(a)(15) was too vague and amorphous to create the private remedy sought by the plaintiffs. *See id.* at 362–64, 112 S.Ct. 1360. Defendants argue that this holding superimposed an additional threshold inquiry upon the standards established in *Golden State* and *Wilder*. This so-called *Suter*-overlay would require that when Congress acts pursuant to its spending power, any condition imposed on federal monies must be set forth "unambiguously." *Suter*, 503 U.S. at 355–56, 112 S.Ct. 1360. A determination of what is a "mandatory" condition requires an examination of "exactly what is required of states" by the statutory provision sought to be enforced. *See id.* at 358, 112 S.Ct. 1360.

Subsequently, Congress expressed its disapproval of *Suter*, amending the Social Security Act in 1994 to state:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the

---

**9.** The August 25 Amended Order deleted an earlier discussion regarding the viability of a private right of action under § 440.230(b) be-

cause it was unnecessary for the Court to reach the issue in view of its substantive holdings. *See Rodriguez*, 177 F.R.D. at 147.

required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in [*Suter*], but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in [*Suter*] that section 671(a)(15) of this title is not enforceable in a private right of action.

42 U.S.C. § 1320a–2 (hereinafter "Amendment"). Plaintiffs argue that this Amendment shows Congress' intent to reject the Supreme Court's reasoning in *Suter* and to require courts to return to the pre-*Suter* approach when deciding whether to recognize a private right of action to enforce provisions other than § 671(a)(15). Defendants, on the other hand, argue that courts should continue to apply a *Suter*-overlay to any analysis of the existence of a private right of action. In support of their position, defendants point to the fact that the Supreme Court has cited *Suter* with approval after the passage of the Amendment. *See Blessing*, 520 U.S. at 342–343, 345, 117 S.Ct. 1353.

In *Blessing*, the Court took issue with the Ninth Circuit's "blanket approach" to determining whether Title VI–D of the Social Security Act creates an enforceable private right of action for mothers alleging that Arizona did not take adequate steps to obtain child support payments. *See id.* at 344, 117 S.Ct. 1353. Concerned that the plaintiffs had not identified with particularity the rights they claimed and the Ninth Circuit had not engaged in the requisite methodological inquiry, the Court remanded the case to the district court with instructions to separately identify the particular rights that may arise from the statutory scheme. *See id.* at 349, 117 S.Ct. 1353. The Court cited *Wilder*, *Wright*, and *Suter* with approval as exam-

ples of the required analysis. *Blessing*, 520 U.S. at 342–43, 117 S.Ct. 1353. However, contrary to defendants' assertions, *Blessing* did not imply that the *Suter*-overlay should continue to apply. In fact, the opinion restated and relied on the *Wilder* test. *See Blessing*, 520 U.S. at 340, 117 S.Ct. 1353.

In addition to the supplemental briefing by the parties, the Court has benefitted from the recent decisions by other courts addressing this issue. While the Second Circuit has not yet addressed the issue, several lower courts within this Circuit have found that Congress expressed its intent to require courts to apply pre-*Suter* case law to determine the private enforceability of SSA provisions other than § 671(a)(15).[10] *See, e.g., McMahon v. Tompkins County Dep't of Soc. Serv.*, No. 95 Civ. 1134, 1998 WL 187421 (N.D.N.Y. Apr.14, 1998); *Vogelsang v. County of Cayuga*, No. 95 Civ. 1123, 1998 WL 146293 (N.D.N.Y. Mar. 25, 1998); *Marisol A. v. Giuliani*, 929 F.Supp. 662 (S.D.N.Y.1996), *aff'd on other grounds*, 126 F.3d 372 (2d Cir.1997). However, there is a split of opinion among the circuit courts that have considered the issue. *Compare Harris v. James*, 127 F.3d 993, 1002–03 (11th Cir. 1997) (rejecting argument that court must 'rewind the clock' to determine federal rights question only according to pre-*Suter* precedents); *with Visiting Nurse Ass'n v. Bullen*, 93 F.3d 997, 1003 n. 5 (1st Cir. 1996) (assuming that Congress intended to resurrect *Wilder* three-part test with no *Suter* overlay). I agree with the other district courts in this Circuit and with the First Circuit that Congress intended to overrule the *Suter*-overlay. Therefore, this Court must "rewind the clock and look to cases prior to *Suter* to determine the enforceability" of the provisions at issue in the instant case. *Marisol*, 929 F.Supp. at 682.

---

**10.** It is not disputed that the Amendment reaffirms the Supreme Court's narrow holding in

*Suter* that no private right exists to enforce § 671(a)(15).

## 2. Application of Standard

Plaintiffs' claims arise under 42 U.S.C. § 1396a(a)(10)(B) and Medicaid regulations found at 42 C.F.R. §§ 440.230(b) and 440.230(c).

### a. 42 U.S.C. § 1396a(a)(10)(B)

■ Plaintiffs have satisfied the *Wilder* test with regard to the enforcement of their Medicaid comparability claim under § 1396(a)(10)(B). First, a plain reading of this section indicates that it is intended to benefit categorically needy persons, which some members of the safety monitoring class undoubtedly are. Second, the comparability provision uses mandatory, rather than precatory language when it states that the medical assistance offered to the categorically needy "shall not" be less than that offered to other categorically needy individuals. Third, the provision is within the competence of the judiciary to enforce, requiring a court to compare the level of services provided to one recipient with those given another and to determine whether those services are comparable. The standards to be applied are set by the State's own actions in setting the level of care to be provided to the categorically needy.

Nevertheless, defendants submit that the comparability provision was not designed to provide an enforceable private right of action, but merely to guide the state in structuring its efforts. Defendants compare this case to *Evelyn v. Kings County Hospital*, 956 F.Supp. 288 (E.D.N.Y.1997). There, Medicaid patients who obtained care at a Medicaid participating hospital did not have a cause of action under § 1983 against state officials for their failure to ensure that the hospital complied with established state health standards. The court noted that the language of the statute plaintiffs sought to enforce, § 1396a(a)(9),[11] did not suggest Congressional intent to mandate the enforcement of state standards "at" participating institutions. Rather, the language indicates that Congress intended that a state agency be responsible for establishing and maintaining health standards "for" participating institutions. *Evelyn*, 956 F.Supp. at 296.

In the instant case, the language of the comparability statute does not suggest, as in *Evelyn*, that it was intended to merely guide the state. As discussed above, the regulation's use of the word "shall" indicates that the regulation mandates that medical assistance provided to any individual must not be "less in amount, duration, or scope" than medical assistance provided to others. 42 U.S.C. § 1396a(a)(10)(B)(i). Therefore, plaintiffs have a private right of action under § 1396a(a)(10)(B).[12]

11. The statute at issue in *Evelyn* states in pertinent part: A state plan for medical assistance must—

 (9) provide—
 (A) that the State health agency ... shall be responsible for establishing and maintaining health standards for private or public institutions in which recipients of medical assistance under the plan may receive care or services. 42 U.S.C. § 1396a(a)(9) (emphasis added).

12. This Court is not alone in reaching this conclusion. Several other courts have found that Medicaid's comparability provision, § 1396a(a)(10)(B), satisfies the *Wilder* test. *See, e.g., Cherry v. Tompkins*, No. C–1–94–460, 1995 WL 502403, *11 (S.D.Ohio Mar.31, 1995) (Medicaid recipients may challenge reasonableness of Ohio's criteria for eligibility for nursing facility services under § 1396a(a)(10)(B) and accompanying regulations 440.230(b) and 440.230(c)); *Sobky v. Smoley*, 855 F.Supp. 1123 (E.D.Cal.1994) (Medicaid recipients may challenge California's provision of Medicaid funded methadone maintenance treatment under § 1396a(a)(10)(B)); *Greenstein v. Bane*, 833 F.Supp. 1054 (S.D.N.Y.1993) (New York City Medicaid recipients may challenge state and federal governments' failure to reimburse plaintiffs for out-of-pocket expenses for authorized medical services under § 1396a(a)(10)(B)); *see also Blanchard v. Forrest*, 71 F.3d 1163, 1167–8 (5th Cir.1996) (holding that Louisiana Medicaid retroactive coverage policy violates § 1396a(a)(10)(B) and (a)(35) without discussion of private right of action).

### b. Medicaid Act Regulations

■ Plaintiffs argue that defendants' safety monitoring policy violates two Medicaid provisions of the Department of Health and Human Services regulations, 42 C.F.R. §§ 440.230(b) and 440.230(c).[13] Plaintiffs first contend that defendants' implementation of TBA violates the federal regulation that "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b).[14] Plaintiffs also contend that defendants' implementation of TBA violates the federal regulation that "[t]he Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).

■ Federal law enforceable under § 1983 includes federal regulations. *See Wright,* 479 U.S. at 420, 107 S.Ct. 766.[15] Here, both regulations defining the contours of plaintiffs' right to "reasonable standards" for determining their eligibility for and extent of their medical assistance under § 1396a(a)(17), meet the three-part *Wilder* test. First, both are clearly intended to benefit Medicaid recipients by ensuring they will receive the services needed to meet the purposes of the Medicaid Act and not be denied services solely due to their diagnosis, rather than their medical need. Second, the language of both regulations is mandatory, not precatory. Any state participating in the federal Medicaid program must provide services sufficient in "amount, duration, and scope" to reasonably achieve the objective of the services and must not deny services based on diagnosis. The language of the Medicaid Act indicates that Congress intended to require states to adopt "reasonable standards" for determining eligibility for and the extent of medical assistance under the plan to meet the primary objective of Medicaid of providing necessary medical care. 42 U.S.C. § 1396a(a)(17). It also indicates that Congress intended that states would provide comparable assistance among recipients. *See* 42 U.S.C. § 1396a(a)(10)(B).

The regulations at issue here are intended to assist plaintiffs and not merely intended to assist the state by providing a yardstick to measure the state's performance. The fact that the state has discretion in adopting standards for determining the scope of the services does not render the regulations unenforceable. *See Wilder,* 496 U.S. at 519–20, 110 S.Ct. 2510 ("That the [Boren] [A]mendment gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the amendment, but it does not ren-

---

13. Authority to administer the Medicaid program and promulgate implementing regulations has been delegated to the Federal Health Care Financing Administration ("HCFA"), a constituent agency of HHS. *See* 42 U.S.C. § 1302; H.H.S. Statement of Organization, Functions, and Delegations of Authority, 49 Fed.Reg. 35,247 (1984).

14. In my August 25 Opinion, I concluded that because plaintiffs had failed to show a substantial likelihood of success on the merits of their comparability claim with respect to unscheduled and recurring needs, there was no need to decide whether plaintiffs had a private right of action under this regulation. *See Rodriguez,* 177 F.R.D. at 163 n. 27.

15. A private right of action deriving from various Medicaid regulations has been recognized in several Circuits. *See, e.g., Doe, 1–13 v. Chiles,* 136 F.3d 709 (11th Cir.1998). Interestingly, some courts have enforced § 440.230(b) without a discussion of private rights of action under § 1983. *See, e.g., Weaver v. Reagen,* 886 F.2d 194, 197 (8th Cir.1989) (denial of AZT coverage to AIDS/HIV patients violates regulation); *Mitchell v. Johnston,* 701 F.2d 337 (5th Cir.1983) (denial of Medicaid coverage for certain dental services to children violates regulation); *Hunter v. Chiles,* 944 F.Supp. 914 (S.D.Fla.1996) (denial of augmentation speech devices violates regulation); *Ledet v. Fischer,* 638 F.Supp. 1288 (M.D.La.1986) (denial of eyeglasses to Medicaid recipients violates regulation).

der the amendment unenforceable by a court").

The third factor,· whether the regulations are too vague or amorphous or not within the competence of the judiciary to enforce, is a slightly more difficult question. It is within this Court's competence, as it was within the *Wilder* Court's competence, to determine if defendants have abused their discretion in determining the scope of services to be provided under the program. In *Wilder,* the Court, considering Medicaid Act language requiring "rates the State finds are reasonable and adequate," held that:

> While there may be a range of reasonable rates, there certainly are some rates outside that range that no State could ever find to be reasonable and adequate under the Act.

*Wilder,* 496 U.S. at 519, 110 S.Ct. 2510.

Finally, these regulations further the purpose of·the underlying Medicaid statute. For example, § 440.230(b)'s mandate requiring that "[e]ach service be sufficient in amount, duration, and scope to reasonably achieve its purpose," is found in 42 U.S.C. § 1396a(a)(10)(B) and § 1396a(a)(17). Once New York sets its goal for the home care program to maintain the health and safety of eligible individual in their homes, the State may not allow its services to fall below the "floor" set by § 440.230(b). Therefore, home care services must be "sufficient in amount, duration, and scope" to meet the goal of maintaining eligible individuals in their

homes and communities and avoiding institutionalization. Section 440.230(b) also implements the statutory requirement that state Medicaid plans "include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan," 42 U.S.C. § 1396a(a)(17).

The prohibition of discrimination based on diagnosis, § 440.230(c), is related to the statutory provisions regarding "reasonable standards" and "amount, duration, and scope". 42 U.S.C. §§ 1396a(a)(17) and 1396a(a)(10)(B). Section 440.230(c) also derives from the "equality principle" of the statute mandating equal medical assistance to all recipients. *See* 42 U.S.C. § 1396a(a)(10)(B) and 1396d(a). Therefore, I find that both regulations create an enforceable private right of action.[16]

### 3. The Merits of Plaintiffs' Medicaid Claims

#### a. 42 U.S.C. § 1396(a)(10)(B)

As I found in the August 25 Opinion, the safety monitoring required by mentally·impaired individuals is comparable to the services provided to physically impaired individuals. Defendants have not presented any new arguments to convince the Court that its previous conclusion was erroneous. I find, for the reasons stated in the August 25 Opinion, that plaintiffs have succeeded on·the merits of their comparability claim. *Rodriguez,* 177 F.R.D. at 157–161. Those reasons are deemed incorporated into this opinion and Order.[17]

---

**16.** In addition, the Supreme Court's recent vacatur and remand of a Second Circuit decision for the court's consideration of the "interpretive guidance issued by [HCFA] on September 4, 1998," indicates that the Supreme Court considers § 440.230(c) to be enforceable by a class of Medicaid recipients. *DeSario v. Thomas,* 139 F.3d 80 (2d Cir.1998), *order vacated sub. nom., Slekis v. Thomas,* — U.S. ——, 119 S.Ct. 864, 142 L.Ed.2d 767 (1999). The HCFA interpretive guideline cites § 440.230(c) for the proposition that a state would only be in compliance with ·federal Medicaid requirements if the process for determining individuals' requests for medical

equipment does not violate the prohibition on "arbitrary limitations on mandatory services ... based solely·on diagnosis, type of illness, or condition.". HCFA correspondence to State Medicaid Directors, dated September 4, 1998, attached to Plaintiffs' Supplemental Memorandum.

**17.** Likewise, this Opinion incorporates my prior reasoning and holding for plaintiffs' claim under 42 C.F.R. § 440.240(b). *See Rodriguez,* 177 F.R.D. at 157–161. That regulation provides:
> Except as limited in § 440.250—
> (b) The plan must provide that the services available to any individual in the fol-

Therefore, because safety monitoring is comparable to other personal care services tasks, defendants' failure to separately assess the task of safety monitoring violates the comparability provisions of the Medicaid Act.[18]

### b. Plaintiffs' Regulatory Claims

█ In addition, plaintiffs succeed on the merits of their regulatory claims. Defendants violate 42 C.F.R. § 440.230(b) and 440.230(c) when they deny home care services to monitor the safety of mentally impaired individuals. The stated objective of the State's services is to provide personal care services to enable recipients to safely reside in their homes. Consequently, the State's current policy of excluding safety monitoring as a recognized task violates the federal mandate that State Medicaid plans provide services that are "sufficient in amount, duration, and scope to achieve [the plan's] purpose." 42 C.F.R. § 440.230(b).

In addition, the State's policy deprives persons of personal care services because they are diagnosed with a mental rather than a physical impairment in violation of § 440.230(c) which prohibits discrimination on the basis of diagnosis. *See White v. Beal*, 555 F.2d 1146 (3rd Cir.1977) (state could not, based on § 440.230(c), limit Medicaid payments for eyeglasses to individuals whose need for eyeglasses stemmed from a pathology as opposed to a common visual impairment).

### B. Plaintiffs' Claims Under the Americans With Disabilities Act and the Rehabilitation Act

In 1973, Congress passed the Rehabilitation Act which included § 504—the first civil rights bill for disabled persons. Under § § 04, any entity that receives federal funds is prohibited from discriminating on the basis of disability. *See* 29 U.S.C. § 794. The Americans With Disabilities Act of 1990, as amended (the "ADA"), 42 U.S.C. § 12132, borrowed heavily from the remedies, procedures and rights available for a violation of the Rehabilitation Act § 504. *See* 42 U.S.C. § 12133. Because § 504 and the ADA impose the same requirements, I need not consider the statutes separately. *See Cercpac v. Health and Hospitals Corp.*, 147 F.3d 165, 167 (2d Cir.1998).

█ These anti-discrimination statutes constitute a federal mandate to end discrimination against individuals with physical and mental disabilities and to bring them into the mainstream of American life. While the Rehabilitation Act prohibits discrimination by programs receiving federal funds, Title II of the ADA extended the anti-discrimination principle to the instrumentalities of state and local government. *See Easley v. Snider*, 36 F.3d 297, 300 (3rd Cir.1994). The ADA provides as follows:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.[19] To establish a cause of action under the ADA or § 504, plaintiffs must show that: (1) plaintiffs have a disability; (2) plaintiffs are "otherwise

---

lowing groups are equal in amount, duration, and scope for all recipients within the group:
 (1) The categorically needy.
 (2) A covered medically needy group.

**18.** Of course, the possibility still exists that many recipients and applicants may not meet the fiscal cap imposed on the personal care services plan.

**19.** Similarly, § 504 provides:

> No otherwise qualified individual with a disability in the United States, as defined in § 706(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .
> 29 U.S.C. § 794(a).

qualified" for the benefit in question; and (3) plaintiffs were excluded from the benefit because of discrimination based solely on disability. *See* 29 U.S.C. § 794; 42 U.S.C. § 12132; *see also Doe v. University of Md. Medical Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir.1995). As a remedial statute, the ADA must be broadly construed to effectuate its purpose. *See Tcherepnin v. Knight*, 389 U.S. 332, 335, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

### 1. Applicability of Anti–Discrimination Statutes to This Case

 Defendants argue that the ADA and § 504 only prohibit discrimination against the disabled in comparison to the non-disabled. Therefore, defendants assert, the anti-discrimination statutes are inapplicable in this case—where one class of disabled individuals claims it is treated discriminatorily in comparison to another class of disabled individuals. Citing cases from other circuit courts, plaintiffs, in turn, contend that their anti-discrimination claims are indeed cognizable.

While the Supreme Court has held that these anti-discrimination statutes require "even-handed treatment" of the disabled and non-disabled, *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), it has never explicitly held that they are inapplicable in a *Rodriguez*-type context.' In *Choate*, Medicaid-eligible disabled individuals raised a § 504 challenge to Tennessee's reduction of the number of inpatient hospital days per year (from 20 to 14 days) for which it would reimburse hospitals on behalf of Medicaid recipients. Plaintiffs introduced statistical evidence demonstrating that disabled patients were more likely than non-disabled patients to require more than 14 days of hospitaliza-

tion per year. The Court upheld Tennessee's across the board reduction, reasoning that it "will leave both handicapped and non-handicapped Medicaid users with identical and effective hospital services fully available for their use, with both classes of users subject to the same durational limitation." 469 U.S. at 302, 105 S.Ct. 712.

*Choate* challenged a general limitation which applied equally to both handicapped and non-handicapped recipients. Here, plaintiffs challenge a restriction placed only on individuals with mental disabilities who are denied the services offered to individuals with physical disabilities. *Choate* is silent regarding the proposition advanced by defendants—that neither the ADA nor § 504 requires a public entity to treat all persons with disabilities in the same fashion.[20]

In three cases following *Choate*, the Second Circuit has stated that the purpose of the anti-discrimination statutes is to bar discrimination against disabled individuals in comparison to the non-disabled. However, each of these cases is factually distinguishable from this case. For example, in *Cercpac v. Health & Hospitals Corp.*, 147 F.3d 165 (2d Cir.1998), parents challenged the closing of a specialized health care facility for their disabled children under § 504 and the ADA. The closing reduced the level of care by referring the children to another facility, farther away, which did not provide a full panoply of services.

The Second Circuit held that plaintiffs failed to state a claim because they were unable to show that disabled persons had been denied equal access to a general health care service. Plaintiffs failed to allege that any disabled child had been denied a necessary basic medical service

---

**20.** In another supreme Court case, *Traynor v. Turnage*, 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), alcoholic veterans challenged a provision of the GI Bill concerning educational assistance benefits that treated veterans who are disabled through no fault of their own more favorably than able-bodied veterans or veterans who became disabled through their own "wilful misconduct". The Court held that a Veterans' Administration regulation defining alcoholism as "wilful misconduct" did not violate the Rehabilitation Act, reasoning that the veterans were not "denied benefits 'solely by reason' of their handicap, but because they engaged with some degree of wilfulness in the conduct that caused them to become disabled." *Id.* at 549–550, 108 S.Ct. 1372.

provided to a non-disabled child, or that any disabled child had been "denied some additional specialized service that might be required as a reasonable accommodation of the child's disability." 147 F.3d at 168. The court noted that the disabilities statutes do not guarantee any particular level of medical care for disabled persons, nor do they assure maintenance of service previously provided.

In *Doe v. Pfrommer,* 148 F.3d 73 (2d Cir.1998), plaintiff, who suffered from a personality disorder, received job counseling services from the New York State Office of Vocational and Educational Services for Individuals with Disabilities (VESID). When plaintiff's mental health deteriorated, VESID discontinued his job counseling benefits. Doe filed suit alleging that VESID violated § 504 and the ADA. The district court granted summary judgment for defendant finding that plaintiff could not show he was "otherwise qualified" for the benefits he sought. The Second Circuit affirmed on different grounds—finding that while the tailored vocational services requested by plaintiff as 'reasonable modifications' might be required by Title I of the Rehabilitation Act, they were not required under the ADA or § 504. *See id.* at 82.

> [I]t is important to bear in mind that the purposes of such statutes are to eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied.... [I]t is clear that the plaintiff is in essence challenging the adequacy of his VESID services, not illegal disability discrimination.

*Id.* at 82, 84.

In *Flight v. Gloeckler,* 68 F.3d 61 (2d Cir.1995), plaintiff, who had multiple sclerosis, was restricted to a wheel chair with limited use of his upper body. He petitioned VESID for $10,500 to modify a van so that he could drive it. VESID provides financial assistance to persons with disabilities to make modifications to vehicles so

that they can be used to pursue "vocational objectives". VESID determined that Flight was too severely disabled to drive a motor vehicle. In addition, VESID found that Flight was not entitled to a modification subsidy because access to a van was not necessary for Flight's vocational objective—that of 'homemaker'. Nevertheless, VESID allotted plaintiff $4,000—the amount necessary to modify the van so that Flight could travel in it as a passenger. The Second Circuit affirmed the dismissal of plaintiff's § 504 and ADA claims, stating that the Rehabilitation Act does

> not clearly establish an obligation to meet [a disabled person's] particular needs vis-a-vis the needs of other handicapped individuals, but mandates only that services provided non-handicapped individuals not be denied [to a disabled person] because he is handicapped.

*Id.* at 63 (citing *P.C. v. McLaughlin,* 913 F.2d 1033, 1041 (2d Cir.1990)). While the Second Circuit discouraged challenges to the allocation of resources among the disabled under the Rehabilitation Act, it rested its opinion on the fact that plaintiff was not "otherwise qualified" to receive the benefit because he could not drive. *Id.* at 64.

The instant case is distinguishable from these cases for several reasons. First, the *Rodriguez* plaintiffs are "otherwise qualified" for personal home care services. A "qualified individual with a disability" is "an individual with a disability [21] who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). In the August 25 Opinion, I found that the safety monitoring injunction would apply to individuals with mental impairments who meet New York State's eligibility criteria for the Medicaid personal care services program. *See Rodriguez,* 177 F.R.D. at 148. Dis-

---

**21.** Defendants have not disputed that plaintiffs are "disabled".

abled plaintiffs meet the essential eligibility requirements of the home care program as long as they have a stable medical condition and are self-directing. *See* 18 N.Y.C.R.R. § 505.14(a)(4).[22] Second, the decision to deny personal home care benefits to mentally impaired individuals is motivated 'solely by reason' of their handicap and not because of any wilfulness in their conduct. *See Traynor*, 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988).

Third, the Second Circuit's own language that the anti-discrimination statues "mandate[ ] only that services provided non-handicapped individuals not be denied [to a disabled person] because he is handicapped," applies to this case. *Flight*, 68 F.3d at 63. This application becomes apparent when one frames the issue not as a comparison between mentally disabled and "physically disabled" individuals as defined under the ADA, but rather as a comparison between the mentally disabled and the mentally able. A physically disabled person receiving personal home care services may not always be "disabled" for the purposes of the ADA and § 504. Section 3(2) of the ADA defines a "disability" as a physical or mental impairment that substantially limits one or more of the major life activities of an individual. *See* 42 U.S.C. § 12102(2)(A). Thus, not all impairments are considered a "disability" under the ADA. In determining whether an impairment substantially limits a major life activity, three factors are considered: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact of the impairment. *See*

42 U.S.C. § 12111(8) 29 C.F.R. § 1630.2(j)(1). "Intermittent, episodic impairments are not disabilities, the standard example being a broken leg." *Vande Zande v. Wisconsin*, 44 F.3d 538, 544 (7th Cir.1995) (citing 29 C.F.R. § 1630 app., § 1630.2(j)). A temporary or non-chronic impairment, such as a broken hip, may not be considered a "disability" for purposes of the ADA. If the hip heals improperly, resulting in long-term difficulty in walking, the individual might then be deemed "disabled". An elderly Medicaid recipient with a broken hip may receive personal home care services in New York State without being considered "physically disabled" for the purposes of the ADA. Were one to compare this individual with the mentally impaired individuals currently denied care, it would seem that mentally impaired individuals are then denied "even-handed" treatment vis-a-vis the non-disabled.

Fourth, it is unlikely that the Second Circuit intended the extreme interpretation suggested by defendants here—that the anti-discrimination statutes offer no protection for the mentally disabled when they are discriminated against by a public entity which does not provide any services to healthy individuals. Consideration of the term "mentally disabled" in the context of the Second Circuit's logic would reveal the following: "it is important to bear in mind that the purposes of such statutes are to eliminate discrimination on the basis of [mental] disability and to ensure evenhanded treatment between the [mentally] disabled and the [mentally] able-bodied." *Pfrommer*, 148 F.3d at 82.[23]

---

**22.** Plaintiffs meet these eligibility criteria for the same reasons explained in the August 25 Order. For an explanation of the terms "stable medical condition" and "self-directing," *see* 177 F.R.D. at 148.

**23.** While this case is distinguishable from other Second Circuit cases which have not recognized the applicability of the anti-discrimination statutes, it should be noted that other circuits have explicitly permitted disabled plaintiffs to challenge discrimination among

classes of disabled persons. Second Circuit decisions are binding on all inferior courts in this circuit despite the existence of what may be a split of opinion between the Second Circuit and other circuit courts of appeals. *See Ithaca College v. N.L.R.B.*, 623 F.2d 224, 228 (2d Cir.1980). Nevertheless, the Supreme Court has recently granted a petition for certiorari to consider a similar issue. It is conceivable that the Supreme Court will decide the issue adversely to the *Rodriguez* defendants' interpretation of the statute's appli-

## 2. The Merits of Plaintiffs' ADA and § 504 Claims

### a. "Qualified Individual" With A Disability

As stated above, plaintiffs are "otherwise qualified" for the home care program provided that they have a stable medical condition and are self-directing. *See* 18 N.Y.C.R.R. § 505.14(a)(4). But the construction of this term is not so simple. Courts have noted that it is difficult to apply the traditional analysis for determining whether an applicant meets the "otherwise qualified" prong of its prima facie case within the context of public programs directed specifically at the disabled. *See, e.g., U.S. v. University Hosp.,* 729 F.2d 144, 156 (2d Cir.1984) (phrase "otherwise qualified" "cannot be applied in the comparatively fluid context of medical treatment decisions without distorting its plain meaning"). The traditional meaning of "otherwise qualified"

> refers to a person who is qualified *in spite* of her handicap and that an institution is not required to disregard the disabilities of a handicapped applicant, provided the handicap is relevant to reasonable qualifications for acceptance or

cability. Therefore, I will briefly review the opinions of these other circuits.

In *L.C. v. Olmstead,* 138 F.3d 893 (11th Cir.1998), *reh'g en banc den.,* 149 F.3d 1197, *cert. granted sub nom, Olmstead v. L.C. by Zimring,* —— U.S. ——, 119 S.Ct. 617, 142 L.Ed.2d 556 (1998), the Eleventh Circuit held that the ADA and the Department of Justice's integration regulation, 28 C.F.R. § 35.130(d), prohibited a state from confining disabled individuals in psychiatric institutions when the individuals could have been appropriately treated in a more integrated community setting. The *Olmstead* defendants argued that the ADA requires a comparison of the treatment of disabled individuals with that of non-disabled individuals and that the ADA affords no protection to individuals with disabilities who receive public services designed only for individuals with disabilities. The Eleventh Circuit disagreed, finding no legal authority to support the defendants' position. Rather, the plain language of the statute, its legislative history and regulations indicated that plaintiffs' claim that they were unnecessarily segregated from the community was not foreclosed by the ADA. *See* 138 F.3d at 899.

In addition, the Third Circuit has repeatedly applied the ADA to allegations of discrimination among persons with disabilities based on the type of disability. *See Helen L. v. DiDario,* 46 F.3d 325, 335–336 (3rd Cir.1995) (Department of Public Welfare violated ADA by mandating paralyzed nursing home resident receive required care services in nursing home rather than through attendant care program in her own home for which she was qualified); *see also Wagner v. Fair Acres Geriatric Center,* 49 F.3d 1002, 1016 n. 15 (3rd Cir.1995) ("an action under § 504 exists if a program is found to discriminate between distinct classes of handicapped persons"); *Doe v. Colautti,* 592 F.2d 704, 708 (3rd Cir.1979) (challenging Pennsylvania statute which discriminated against mentally handicapped persons vis-a-vis physically handicapped persons).

The Eighth and Tenth Circuits have agreed with this position. *See, e.g., Jackson by Jackson v. Fort Stanton Hospital and Training School,* 757 F.Supp. 1243 (D.N.M.), *rev'd in part on other grounds,* 964 F.2d 980 (10th Cir.1992) (failure of programs for developmentally disabled to accommodate severely handicapped in existing community programs while serving less severely handicapped persons is unreasonable and discriminatory because severity of plaintiffs' handicaps is itself a handicap which, under § 504, cannot be sole reason for denying access to community programs); *Plummer by Plummer v. Branstad,* 731 F.2d 574, 578 (8th Cir.1984) (assuming severity of plaintiffs' handicaps is itself a handicap which, under § 504, cannot be sole reason for state's denial of funding for adult day care services). *But see Colin K. v. Schmidt,* 715 F.2d 1, 9 (1st Cir.1983) ("Although we have serious doubts whether Congress intended § 504 to provide plaintiffs with a claim for discrimination vis-a-vis other handicapped individuals, the argument is not without support").

Recently, an appellate court in New York State held that a mentally-ill plaintiff who asserted that the ADA mandates that she receive personal care services at home, stated a cognizable claim pursuant to 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d). *See Egan v. DeBuono,* 688 N.Y.S.2d 18 (1st Dep't.1999). In addition, prior to the recent spate of Second Circuit cases, a district court within this Circuit held that the "conclusion that discrimination vis-a-vis other disabled persons is cognizable under § 504 is supported by the bulk of the authority." *McGuire v. Switzer,* 734 F.Supp. 99, 114 n. 16 (S.D.N.Y.1990).

to make substantial modifications in its reasonable standards or program to accommodate handicapped individuals but may take an applicant's handicap into consideration, along with all other relevant factors, in determining whether she is qualified for admission.

*Doe v. New York University*, 666 F.2d 761, 775 (2d Cir.1981) (emphasis in original). Where, as in the context of this case, it is the handicap itself that gives rise to, or at least contributes to, the need for the services in question, the conventional meaning of "otherwise qualified" cannot be meaningfully applied. *See U.S. v. Univ. Hosp.*, 729 F.2d at 156.

Rather, as articulated by the Supreme Court in *Choate*, "the question of who is 'otherwise qualified' and what actions constitute 'discrimination' under [§ 504] would seem to be two sides of a single coin; the ultimate question is the extent to which a grantee is required to make reasonable modification in its programs for the needs of the handicapped." 469 U.S. at 299 n. 19, 105 S.Ct. 712. The appropriate focus, therefore, is not whether plaintiffs are 'otherwise qualified' for personal care services, "but the extent to which the defendants are required by the anti-discrimination statutes to modify their programs to meet all of [plaintiffs'] needs as a disabled individual." *Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir.1998).

**b. Plaintiffs Are Excluded from Benefits Because of Discrimination Based on Disability**

■ Plaintiffs allege that defendants deny mentally impaired individuals the personal care services required for safe maintenance in the home that are provided to others. These services include verbal assistance to perform recognized personal care tasks (e.g.toileting) and independent safety monitoring. It appears to plaintiffs that individuals are denied services solely because their need for such services stems from a mental, rather than a physical impairment.

Defendants defend their decision to deny mentally impaired plaintiffs the services provided to the physically impaired by asserting that they do not provide "safety monitoring" services to any individuals, whether physically or mentally disabled, unless the safety monitoring is in conjunction with a recognized 'task'. As I found in the August 25 Opinion, defendants deny individuals with mental impairments assistance in the form of verbal direction needed to perform recognizable personal care tasks. See 177 F.R.D. at 158–59. Moreover, defendants deny independent safety monitoring to individuals with cognitive impairments. *See id.*

**c. Reasonable Accommodation**

■ "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). "The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program." *Easley v. Snider*, 36 F.3d 297, 305 (3rd Cir.1994). Defendants argue that they cannot accommodate mentally impaired individuals because the provision of independent safety monitoring would alter the essential nature of the program or impose an undue burden.

**i. Essential Nature of Program**

■ The provision of independent safety monitoring would not cause any meaningful alteration of the personal care services program as defined in the state regulations and numerous policy statements since at least 1985. As explained in this Court's August 25 Opinion, "safety monitoring" for mentally impaired individuals is comparable to the safety monitoring provided to physically

impaired individuals. *See* 177 F.R.D. at 159. Moreover, despite defendants' assertions to the contrary, the evidence at the hearing revealed that they have historically provided and continue to provide safety monitoring to guard against such dangers as wandering out of the house and turning on the stove—both of which present dangers to cognitively impaired individuals. *See id.* at n. 19.

Therefore, no alteration is required. The defendants need simply return to their pre-TBA definition of the program which was not limited to "hands-on" assistance with recognized tasks. Defendants recently articulated definition of the program limiting it to "hands-on" assistance tends to exclude people with certain types of disabilities in contravention of the regulations accompanying these statutes.

Regulations of the Department of Health and Human Services provide that a recipient of federal funds may not, on the basis of handicap:

(1) Deny a qualified handicapped person these benefits or services; . . .

(3) Provide a qualified handicapped persons with benefits or services that are not as effective (as defined in § 84.4(b)) as the benefits or services provided to others; . . . or

(5) Provide different or separate benefits or services to handicapped persons except where necessary to provide qualified handicapped persons with benefits and services that are as effective as those provided to others.

45 C.F.R. § 84.52(a). In addition, a recipient of federal funds may not, on the basis of handicap:

(i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; . . .

(iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others.

45 C.F.R. § 84.4(b).

For example, in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Court struck a balance between the statutory rights of the disabled to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs, holding that while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped, it may be required to make "reasonable" ones. *See id.* 412–413, 99 S.Ct. 2361 (nursing program not required to admit hearing disabled plaintiff because modifications plaintiff sought—full-time, personal supervision whenever she attended patients and elimination of clinical courses—would have compromised essential nature of program). Following *Davis*, the *Choate* Court specified that in providing an otherwise qualified disabled persons with meaningful access to a benefit, "the benefit, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled." Furthermore, "antidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit." *Choate*, 469 U.S. at 302 n. 21, 105 S.Ct. 712 (quoting brief for the United States as Amicus Curiae 29, n. 36). Here, defendants have impermissibly attempted to redefine the relevant benefit to exclude individuals on the basis of a mental disability.

Defendants analogize this case to *Easley v. Snider, supra,* to justify their discriminatory safety monitoring policy. In *Eas-*

*ley,* disabled plaintiffs challenged the Pennsylvania Attendant Care Services Act ("Care Act") which was specifically designed to "enable physically disabled persons to live in their homes rather than institutions." *Easley,* 36 F.3d at 298. Plaintiffs were denied eligibility for the program because the Care Act required that candidates be "mentally alert". The Third Circuit found that the state did not violate the ADA by excluding non-mentally alert plaintiffs from the program. In contrast to *Rodriguez,* the program at issue in *Easley* was wholly-funded by the State and was created specifically for mentally-alert, physically disabled individuals so that they might work and manage their own lives. Here, New York State's program is part of a federally approved and funded Medicaid program that was designed to provide personal care services to impaired individuals, even when an individual's mental impairment necessitates the use of a self-directing individual who may or may not be living in the same household or supervision by an outside agency to direct the personal care attendant. *See* 18 N.Y.C.R.R. §§ 505.14(a)(4)(ii)(a)—(c).

#### ii. Undue Burden

Defendants' justifications for denying home care services to the mentally disabled are (1) to reduce costs and (2) to eliminate individuals from the program who pose a "direct threat" to themselves or others.

##### *Costs*

■■■ A permanent injunction, defendants argue, would require a vast increase in the number of hours assessed under the program, causing a major financial burden. It is not known how many Medicaid recipients with Alzheimer's disease or dementia would require home care. Defendants bear the burden of persuasion in showing that the financial burden is "clearly disproportionate" to the benefits it will produce. *See Borkowski v. Valley Central School District,* 63 F.3d 131, 138–139 (2d Cir. 1995). "This requires an inquiry not only

into the benefits of the accommodation but into its costs as well." *Id.* at 138 (citing *Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538, 542 (7th Cir.1995)).

The plain language of the ADA's Title II regulations, as well as the legislative history indicate that Congress intended to permit a cost defense only in the most limited circumstances when an accommodation would "fundamentally alter the nature of the service, program or activity." 28 C.F.R. § 35.130(b)(7).

> The fact that it is more convenient, either administratively or fiscally, to provide services in a segregated manner, does not constitute a valid justification for separate or different services under [§ 504 or the ADA]. The existence of such programs can never be used as a basis to . . . refuse to provide an accommodation in a regular setting.

H.R.Rep. No. 101–485, pt. 3 at 50, reprinted in 1990 U.S.C.C.A.N. at 473. certainly the ADA and § 504 do not require that all mentally ill individuals be afforded home care as opposed to institutionalization. However, the defendants have an obligation to provide appropriately integrated services under both the ADA and § 504. See *Helen L. v. DiDario,* 46 F.3d at 336; *Zimring v. Olmstead,* 138 F.3d 893, 904. In those limited cases where the cost of maintaining a cognitively impaired person at home exceeds the costs defendants would incur to place the individual in a nursing home (90% of the cost of a residential health facility), defendants can look to the fiscal assessment law, just as they do for high cost cases involving persons with physical impairments. *See Rodriguez,* 177 F.R.D. at 160–161.

Under the Attorney General's Title II ADA implementing regulations, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). This regulation has "the force of law" in light of Congressional approval of the § 504 coordination regula-

tion, 45 C.F.R. § 85.21(d). *See Helen L.*, 46 F.3d at 332 (citing legislative history); *L.C. Zimring*, 138 F.3d at 898. This interpretation is entitled to substantial deference. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Similarly, the Attorney General's § 504 coordination regulations mandate that the recipients of federal funds "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d) (1997). The integration principle contained in these regulations ("the most integrated setting appropriate") is consistent with Congress' purpose in enacting the ADA—to combat the historic isolation and segregation of individuals with disabilities. *See* 42 U.S.C. § 12101(a)(2) and (a)(5). Therefore, inappropriate or unnecessary segregation in nursing homes is a form of illegal discrimination against the disabled.

Defendants first argue that providing services to individuals with mental impairments causes "wasteful down-time" that does not occur when providing services to others. This argument merits little attention as personal care services for the physically impaired also involves "down time" for the attendant, as in the 24–hour cases where the attendant is permitted to sleep! Defendants further argue that they are offering comparable care to the mentally and physically disabled, except for the slight difference in the "modality by which that care is to be delivered." See City's Mem. of Law at 7. The "modality" of care for the physically disabled is delivered at home; and the "modality" of care for the mentally ill is through institutional care. The problem with this argument is that the institutionalization of mentally impaired plaintiffs who could otherwise be cared for at home would result in the segregation of the mentally disabled which the ADA sought to end. *See* 42 U.S.C. §§ 12101(a)(2), (3), (5) and (7) (findings and purpose of ADA stating that discrimination against disabled stems from "ster-

eotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to society").

Defendants have not shown that the financial burden of a permanent injunction will be "clearly disproportionate" to the benefits it will produce in preventing the unnecessary segregation of mentally impaired individuals.

### *"Direct Threat"*

■ Defendants raise the affirmative defense that eliminating home care services for the mentally impaired is necessary to eliminate individuals who "pose a direct threat to the health or safety of other individuals." *See* 42 U.S.C. § 12113(b). Defendants have the burden to establish that plaintiffs pose a "direct threat" by creating "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation". 42 U.S.C. § 12111(3). *See New York State Assn. for Retarded Children v. Carey*, 612 F.2d 644, 650 (2d Cir.1979) (exclusion of children who carried serum hepatitis from regular school classes violates Rehabilitation Act because defendant's proof revealed that health hazard was only a remote possibility and isolating children would have detrimental effect). Only extreme conduct will meet the burden necessary to allow defendants to exclude handicapped individuals from a particular program. *See, e.g., Doe v. New York University*, 666 F.2d 761 (2d Cir. 1981) (plaintiff with personality disorder not "otherwise qualified" for admission to medical school due to suicide attempts, smearing blood on office walls and threatening violence which could result in harm to others students, faculty and patients).

As plaintiffs demonstrated during the hearing, while individuals with Alzheimer's may occasionally be a danger to themselves if not monitored properly, it is exceedingly rare for them to be a danger to others. *See* hearing Transcript ("Tr.") at 472, 478. Indeed the evidence tended to show that many persons with mental im-

pairments are appropriate for home care. *See* 177 F.R.D. at 159; *see also* Tr. at 469–470, 628, 634–35.

The only incident defendants could cite which arguably demonstrated that an individual with Alzheimer's posed a danger to herself or others concerned Mrs. Russo. According to defendants' account of events, Mrs. Russo, an 82 year-old woman, "physically assaulted her aide, wandered excessively and created hazardous conditions in her home." State Supp. Me. of Law at 8. Prior to the alleged incident, Nassau County had reduced Mrs. Russo's services from 24 hours to four hours three days a week after determining that the other twenty hours of care constituted mere "supervision"—a non-task. After an incident during which Mrs. Russo was agitated and allegedly swung a broom either at her aide or at the bathroom door (the details of the incident are disputed), the County terminated her personal care services based on a finding that she could not be safely maintained at home. *See Rodriguez,* 177 F.R.D. at 159 n. 20.

I am not convinced that this one contested example rises to the level of a "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation" that defendants have the burden of proving. 42 U.S.C. § 12111(3). First, had her hours not been drastically reduced, the incident might never have happened. Moreover, the issue of whether an individual with Alzheimer's poses a significant risk to herself or others should be addressed on a case-by-case basis and not by eliminating safety-monitoring for all such individuals. For the foregoing reasons, plaintiffs have prevailed on their ADA and § 504 claims.

### C. Irreparable Harm

 Having succeeded on the merits, plaintiffs are entitled to permanent injunctive relief if they can show that they will suffer irreparable harm absent such relief. The harm at issue here is the inadequate authorization and denial of personal care services to which they are otherwise entitled. Plaintiffs are elderly, sick and frail. An inadequate home care authorization or denial of any home care could have a devastating effect on their health and safety, causing irreparable harm that cannot be compensated with damages. The Second Circuit recognizes that the denial of essential medical benefits to Medicaid recipients constitutes irreparable harm sufficient for the issuance of an injunction. *See Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328 (2d Cir.1995) (affirming issuance of preliminary injunction requiring apartment building to provide parking space to plaintiff with multiple sclerosis based on "risk of injury and humiliation from her inability to walk distances and her incontinence"); *see also Caldwell v. Blum,* 621 F.2d 491, 498 (2d Cir.1980) (preliminary injunction granted to medically needy individuals denied Medicaid benefits who would, "absent relief, be exposed to the hardship of being denied essential medical benefits").

Moreover, the possible alternative to home care services—involuntary separation from one's home, family and community and institutionalization in a nursing home—is likewise harm that cannot be repaired by money damages. The New York State Legislature has recognized the adverse social and medical consequences of institutionalization.

The legislature hereby finds and declares that the provision of high quality home care services to residents of New York state is a priority concern. Expanding these services to make them available throughout the state as a viable part of the health care system and as an alternative to institutional care should be a primary focus of the state's actions.

N.Y. Public Health Law § 3600. Therefore, plaintiffs will suffer irreparable harm absent injunctive relief.

Because "public consequences" are implicated by the grant of injunctive relief, the Court must balance the conveniences

and possible injuries to the parties. *See Sierra Club v. Hennessy,* 695 F.2d 643, 649 (2d Cir.1982). It is beyond cavil that injunctive relief will impact State, County, and City budgets, although defendants have difficulty estimating the precise amount. Defendants anticipate the cost of implementing safety monitoring in New York City for applicants with moderate to severe cognitive impairments will be approximately $40.8 million for an estimated 664 new cases during the first year that the Court Order is in effect. The City's share of this cost is 10%, the State's share is 40% and the federal government's share is 50%. *See* Affidavit of Kathleen Tyler ("Tyler Aff."), Director of Management and Support Services for the Home Care Services Program, dated October 3, 1997, at ¶ 3. In addition, the City estimates that it will incur $42 million in penalties if, due to the Order, it fails to meet State cost-containment targets. *See id.* at ¶ 12.

As I noted during oral argument before granting the stay, defendants' figures are speculative. *See* Transcript from October 23, 1997 ("Oct. 23 Tr.") at 5. However, even if the Court were to accept defendants' estimates, the cost of implementing this Order would be a mere fraction of the $2.7 billion total cost of New York State's home care program. In addition, defendants' costs will be offset to the extent defendants intended to substitute institutionalization in nursing homes in place of home care which would be less expensive in some circumstances. While defendants have provided no estimate for the competing costs of nursing home care, it is likely that their estimated costs of implementing this Order will be reduced to the extent that some mentally impaired individuals may be cared for at home at a lesser expense.

Furthermore, the injury that will result to plaintiffs' class without safety-monitoring—involuntary separation from their homes and unnecessary institutionalization in nursing homes—far outweighs the potential harm incurred by defendants.[24] The public has an interest in protecting its most vulnerable members from practices that do not comply with federal law.

## IV. Conclusion

The Court recognizes that two important policies are involved in this case—fiscal policies at all levels of government and the cooperation of federal, state and local governments in providing home health care to those in need of such services. The questions surrounding providing such care to the mentally impaired are thorny. The answers to these questions, however, are straightforward. Federal funds allocated to the States must be spent in accordance with conditions required by all the federal statutes and regulations—including the anti-discrimination statutes.

For the foregoing reasons, plaintiffs' motion is granted. It is accordingly:

ORDERED

That defendants include safety monitoring as a separate task on their TBA forms; assess the need for safety monitoring as a separate task, and calculate any minutes allotted for safety monitoring as part of the total personal care services hours authorized, for both applicants and recipients; and it is further

ORDERED

That the City of New York include the total number of task hours authorized and the allocation of those hours by the number of hours per day as a component of its initial notice, and, to the extent this information is not already included, as a component of its reauthorization notice.

SO ORDERED.

---

24. In the alternative, injury will result to a member of plaintiffs' class who exercises her right to refuse placement in a nursing home. In that event, injury will occur not only to the mentally impaired individual living at home without safety monitoring, but also to her unfairly overburdened family.